# IN THE COURT OF APPEALS OF IOWA

No. 24-2041
Filed January 28, 2026

**Clint J. Wrage,**
Plaintiff–Appellee,

v.

**Nayeli Torres,**
Defendant–Appellant.

Appeal from the Iowa District Court for Bremer County,
The Honorable DeDra Schroeder, Judge.

**AFFIRMED**

Austin J. McMahon of Lange & McMahon, P.L.C., Independence, attorney for appellant.

Lana L. Luhring of Laird & Luhring Law Office, Waverly, attorney for appellee.

Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ. Opinion by Greer, J.

1

**GREER, Judge.**

In this child-custody action, the mother, Nayeli Torres, appeals the district court's orders granting the father, Clint Wrage, primary physical care of their minor child. Clint requests an award of appellate attorney fees. Finding that the best interests of the child are met by an award of joint custody with physical care granted to Clint, we affirm the district court orders, and we award Clint attorney fees in the amount of $5,000.

## I. Background Facts and Proceedings.

Clint and Nayeli are the never-married parents of A.W., born in 2020. In June 2023, Clint filed a petition to establish custody, visitation, and support of the child. The parties could not agree on a physical-care arrangement for the child, so the matter proceeded to trial on October 30 and 31, 2024. The following facts are established by the record at trial.

Clint and Nayeli's relationship began in 2019 and ended in 2023. At the time of trial, Clint was 32 years old and Nayeli was 29 years old. The child was four-and-a-half years old.

Nayeli has an older child from a prior relationship, A.W.'s half-sibling, who was seven years old at the time of trial. Pursuant to a separate custody decree, the half-sibling is in the primary physical care of his father, with Nayeli having visitation. Nayeli testified at trial that she and the half-sibling's father had recently reached a shared-physical-care agreement.

Prior to their breakup, both Clint and Nayeli provided care for the child. Nayeli asserts that "she had always been the primary care parent for [the child], and . . . she provided support not only for [the child] but also for Clint." However, Nayeli worked evening and overnight shifts at times, leaving both the child and her half-sibling in Clint's care.

Nayeli alleges that after the breakup, she was the primary care parent and Clint did not request visitation from the date he filed the custody petition in June 2023 until December 2023, when he requested to have time with the child for Christmas. Clint provided little financial support during this time.

However, the record also indicates that Nayeli was reluctant to let Clint have contact with the child and often insisted on supervising their visits. For example, Nayeli refused to let Clint take the child to his grandmother's funeral in September 2023. Additionally, Clint had to file an emergency motion for visitation for Christmas 2023 after Nayeli refused to let Clint see the child on Christmas Eve or Christmas. In April 2024, Clint decided he was going to have the child spend the night on a Sunday after a birthday party and he would take her to daycare the following morning. Nayeli responded by driving to Clint's apartment and waiting for him. Clint had the child in the car, so he turned around and left, calling the police. Nayeli attempted to follow him. In mid-2024, Nayeli refused to let Clint see the child on Easter and refused to let the child attend a family graduation. At times, Nayeli would refuse to give Clint updates on the child when she was in Nayeli's care.

The court entered a temporary matters order in July 2024, which ordered the parties to share physical care of the child. Nayeli was ordered to pay Clint child support but, as of the trial, had paid nothing. Clint was flexible with this care schedule, alternating days so that Nayeli could have the child at the same time she had visitation with the child's half-sibling and permitting the child to attend birthday parties with Nayeli during Clint's parenting time.

Things did not always go smoothly despite the temporary custody arrangement. Once, during a custody exchange, the child showed up crying.

In the audio recording, at the hand-off, Nayeli is heard telling the child that they were going to a parade without her but that Nayeli would get her some candy. Clint testified that this was an attempt to make him out to be the bad guy. He also testified that similar attempts to sabotage pickups were common.

At trial, Clint agreed that he would be able to support the child's relationship with Nayeli and would allow for open communication, such as facilitating calls between the child and Nayeli while the child was in his care. Clint also testified that he would support maximizing the child's time with her half-sibling on holidays and during the summer.

Conversely, when asked whether she thought she could get along with Clint, Nayeli testified, "I find it very difficult to see the long-term of getting along." She also testified to her strong belief that Clint was "not a good person," adding, "I do think he's a bad person. I think he chooses to hurt people."

Clint's primary focus during trial was Nayeli's mental-health concerns and inability to regulate her emotions. Clint testified that he believed Nayeli used threats of self-harm and suicide "as a weapon to get what she wanted." The record established that Nayeli threatened or attempted suicide on at least three occasions, twice before the child was born and once while she was caring for the child.

The first instance, in 2015, involved Nayeli climbing a tree and threatening to harm herself, which required law enforcement intervention. This incident occurred after Nayeli and her ex-boyfriend broke up.

The second instance occurred in July 2019, after Nayeli suspected Clint was talking with other women. On that date, Nayeli and Clint picked

up the half-sibling from daycare in Nayeli's car. With the half-sibling in the car, Nayeli became upset and drove eighty to ninety miles per hour to Clint's mother's home, where he was staying at the time. Clint got out of the car and Nayeli sped off, only to return a short time later, again with the half-sibling still in the car. Clint was unaware that Nayeli had returned until he heard gunshots outside. Clint found Nayeli firing shots into the yard with a handgun. Clint was able to get the gun away from Nayeli. Nayeli then took the half-sibling out of the vehicle and told him she loved him and would miss him. At this point, Nayeli ingested the contents of a bottle of prescription medication. Clint, unsure how many pills Nayeli had taken, got Nayeli and the half-sibling into the vehicle and drove to the hospital. At the hospital, Nayeli had to be put on a ventilator, and Clint stayed with the half-sibling until the child's father was able to pick him up.

During the third incident, after Clint and Nayeli broke up in 2023, Nayeli drove to Clint's mother's house with the child in the car. When she saw Clint driving down the gravel road outside his mother's house, she began following him closely at a high rate of speed. Clint realized the situation was dangerous, so he decided to slow down. Clint testified that Nayeli followed him three separate times this day until he involved the police. During one of the instances, Nayeli pulled up alongside Clint and told him she wanted to die. The child was in the backseat. Clint asked Nayeli to let him take the child while she calmed down, but Nayeli sped off. When Clint went back to his mother's house, Nayeli returned, came to the door, and tried to break in, asking for a hug. Nayeli was holding the child in her arms at the time.

At trial, several additional instances of unstable behavior were detailed. From 2016 to 2021, Nayeli was the subject of a no-contact order after harassing a former boyfriend. She was charged with violating the no-

contact order and spent ten days in jail.  In 2022, Nayeli briefly worked for the Boys and Girls Club until she was fired for breaching confidentiality.  In another incident, Nayeli learned that her older child's stepmother was applying for a job, so she called the prospective employer to give them negative information about the stepmother in an effort to sabotage her application.

Nayeli focused on allegations of Clint's substance use and domestic violence.  Nayeli testified that shortly before their relationship began, Clint was struggling with substance-use and mental-health concerns.  Clint admitted to using substances prior to the child's birth but denied using them at any time relevant to this case.  The district court found Clint's testimony about his substance use credible.

Nayeli also testified that there was domestic violence in the relationship.  Nayeli testified about a 2019 incident during which she was driving her vehicle with Clint in the passenger seat when he grabbed the wheel, causing it to steer into a ditch.  During this same incident, Nayeli alleged that Clint grabbed her by the neck, hit her head against the steering wheel, and broke her windshield.  Clint denied these allegations, but he did admit to grabbing the steering wheel because Nayeli was driving recklessly.  Nayeli did not report this incident to the police, nor did she seek a protective order against Clint.

Apart from the 2019 incident, Nayeli testified that there was a lot of pushing and shoving in the relationship.  Nayeli also testified that, shortly after the child was born, she went to Clint's mother's house and Clint began screaming at her, grabbed her by the throat, and pushed her up against a wall.  Both Clint and his mother denied that her version happened, although Clint did admit there was mutual pushing and shoving throughout the relationship.

Nayeli again did not contact the police or request a protective order after this incident.

After hearing all the evidence, the district court granted joint custody with primary physical care to Clint, and visitation to Nayeli. Nayeli was ordered to pay child support.

In awarding Clint primary physical care, the court concluded,

> The inability of [Nayeli] to regulate her emotions and placing her children in mentally and physically unsafe circumstances is a cause for deep concern. While her behaviors have periods of improvement, when again faced with difficult circumstances, she is unable to behave in a mature, safe and appropriate manner. This has been her pattern. It would be bad enough if these behaviors occurred outside of the presence of her children, but she has subjected [the child] to these situations. Adding to those concerns is the fact that [Nayeli] disregards court orders and basic employment expectations of confidentiality.[1] It is only fair to conclude that [the child] may imitate what she sees and hears. This court sincerely hopes [Nayeli] addresses these concerns for her sake and for her children's. Ideally, the parties should settle into a positive co-parenting relationship, communicate respectfully, place the child's needs first and avoid prolonged court battles. This child deserves peace and stability.
>
> Another factor supporting this Court's decision is that [Nayeli] seems uninterested in co-parenting [the child] with [Clint]. The importance of the physical care parent's promotion of the other parent's relationship with the child is well established. Until the Court intervened, [Nayeli] seemed perfectly content to keep [Clint's] involvement in the child's life to an absolute minimum.
>
> The parties are granted joint legal custody with primary physical care to [Clint]. Shared physical care is not in the best interests of [the child]. [Nayeli] cannot communicate in a calm and reasonable manner and cannot support the role of [Clint] as the child's father.

---

[1] This relates to an incident described at trial regarding Nayeli holding a "jealous-type grudge[]" against one of Clint's ex-girlfriends.

Nayeli filed a motion to reconsider requesting various changes to the visitation schedule, but noted she was "not acquiescing to any of the factual findings, legal conclusions, or rulings in the Final Order/Decree and is not waiving any objections or disputes regarding the same." The court granted Nayeli's motion in part, concluding that Nayeli's "alternate weekend visitation and Wednesday visitation may commence at the conclusion of school or no later than 4 PM." The court denied the remainder of Nayeli's motion to reconsider. Nayeli now appeals both the custody order and the order granting in part and denying in part her motion to reconsider.

## II. Standard of Review.

We review custody orders de novo. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007); *Thorpe v. Hostetler*, 949 N.W.2d 1, 4 (Iowa Ct. App. 2020). "We give weight to the findings of the district court, especially to the extent credibility determinations are involved." *Hansen*, 733 N.W.2d at 690.

"We review evidentiary rulings for an abuse of discretion." *State v. Fontenot*, 958 N.W.2d 549, 555 (Iowa 2021).

## III. Analysis.

On appeal, Nayeli has raised several arguments that can be boiled down to the following: (1) the district court improperly granted primary physical care to Clint; (2) the district court erred in partially denying her motion to reconsider; and (3) the district court erred in sustaining a foundation objection to one of Nayeli's exhibits. We will consider Nayeli's arguments in turn.

**A. Physical Care Determination.** The bulk of Nayeli's appellate brief is dedicated to various arguments regarding how the district court improperly weighed the evidence in awarding Clint primary physical care. On our de novo review, we agree with the district court that Clint is the proper parent to have primary physical care of the child. To get to that conclusion we apply our long-standing considerations based on our caselaw and applicable statutes.

"When considering the issue of physical care, the child's best interest is the overriding consideration." *In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007). "We are guided by the factors set forth in Iowa Code section 598.41(3) as well as those identified in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974)." *Id.*; *see also* Iowa Code § 600B.40 (2024) (applying the section 598.41(3) factors to custody arrangements for a child born out of wedlock). We aim "to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695.

"We do not award custody based on hours of service for past care. We attempt to look to determine which parent will in the future provide an environment where the child is most likely to thrive." *In re Marriage of Engler*, 503 N.W.2d 623, 625 (Iowa Ct. App. 1993). Where there are "two suitable parents, our physical-care analysis places special weight on (1) the stability and continuity of caregiving; (2) the ability of the parents to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) the degree to which the parents are in general agreement about their approach to daily matters." *Smart v. Ralls*, No. 24-1575, 2025 WL 2058783, at *2 (Iowa Ct. App. July 23, 2025) (cleaned up); *see also Hansen*, 733 N.W.2d at 696–99.

9

As discussed above, the parties have each provided care for the child in the past. While the parties were still together, they shared care of the child. After the parties broke up, Nayeli had more parenting time, in part because she often refused to let Clint see the child. The parties have had shared care of the child since the temporary matters order. We do not find that the factors of stability, continuity, and approximation weigh in favor of making Nayeli the primary-care parent; instead the stability factor weighs heavily toward Clint.

Further, the record at trial established that Nayeli, at times, is "unable to regulate her emotions," "exercises poor judgment," and "struggles with her mental health" particularly when she encounters issues in her relationships. Many of the incidents discussed at trial were years old, but Nayeli presented no evidence to show that she took any steps to address and alleviate these concerns before trial. Instead, Nayeli engaged in a pattern of behavior over time that had not improved.

Importantly, Nayeli showed that she is presently incapable of supporting the relationship between Clint and the child. Clint was able to separate any negative feelings about Nayeli from her role as the child's mother. Nayeli was not able to do the same, testifying that she did not know if she and Clint could get along and to her strong belief that Clint is not a good person. In contrast, Clint was flexible with the parenting schedule, keeping in mind what was best for the child, rather than his own feelings and desires. Nayeli, on the other hand, attempted to control Clint's contact with the child, letting her personal feelings toward Clint dictate whether he could see the child. We find that Clint is the parent who can better communicate and show respect and thus will support Nayeli's relationship with the child going forward.

Finally, we find the court properly prioritized maximizing contact between the child and her half-sibling. As noted above, the half-sibling is only in Nayeli's care part-time. The district court's order attempted to craft a visitation schedule that "shall coincide, as much as possible, to the parenting time [Nayeli] has with [the half-sibling]." The court adopted the parties' agreed-upon holiday schedule that matches the schedule Nayeli follows for the half-sibling. The court crafted the summer schedule such that Nayeli could select her summer parenting time "by May 1 of each year." That will allow her to coordinate parenting schedules to have the children at the same time. We find the district court's visitation schedule properly considered maximizing contact between the child and her half-sibling.

In sum, the child's best interests are supported with Clint as the physical-care provider.

**B. Denial of Motion to Reconsider.** Nayeli next challenges the partial denial of her motion to reconsider, which requested various minor amendments to the parenting schedule. Specifically, Nayeli requested additional visitation with the child on any day the child gets out of school or daycare early or does not have school or daycare and Clint cannot spend time with the child. She also requested six rather than four nonconsecutive, uninterrupted, one-week periods of time with the child in the summer.

We note the court did make some adjustments to the schedule, and we decline to amend it further. The schedule applies to the extent "the parties are unable to otherwise agree." From our review of the testimony, Clint was willing to work with Nayeli if it was in the best interests of the child. Thus, we find the current parenting schedule supports each parent's relationship with the child and the child's best interests, and we decline to disturb it.

11

**C. Exclusion of Exhibit.** Finally, Nayeli argues that the district court abused its discretion when it sustained Clint's foundation objection to one of Nayeli's exhibits. Nayeli attempted to offer a photograph of a cellphone screen showing an undated text-message thread. To lay foundation for the exhibit, Nayeli testified that, at some point, she took Clint's phone, found the thread, and took a photograph of the texts with her own phone. According to Nayeli, the text message thread was between Clint and an ex-girlfriend, although Nayeli did not testify about how she knew that. Nayeli had no personal knowledge of the content of the text message thread. On appeal, Nayeli argues that her testimony, based on her alleged personal knowledge, was sufficient to lay the foundation for the exhibit. We disagree.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Iowa R. Evid. 5.901(a). This requirement may be satisfied by "[t]estimony that an item is what it is claimed to be." Iowa R. Evid. 5.901(b)(1). In order to provide this testimony, the witness must have "personal knowledge of the matter." Iowa R. Evid. 5.602. While it is true that "the burden to authenticate is not high—only a prima facie showing is required, . . . a district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which a jury could reasonabl[y] find that the evidence is authentic." *State v. Goodwin*, No. 18-1822, 2020 WL 1551149, at *4 (Iowa Ct. App. Apr. 1, 2020) (cleaned up); *see also United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014)).

Our court has previously recognized that "to admit social media evidence, particularly where the exhibit is a printout or screenshot, 'two levels of authentication may be necessary: (1) authentication of the

12

communication or underlying content that existed originally in digital form and (2) authentication of the physical download or printout of that content.'" *State v. Guy*, No. 23-0257, 2024 WL 3291807, at *3 (Iowa Ct. App. July 3, 2024) (quoting 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.901:11 (Oct. 2023 update)); *see also State v. Simpson*, No. 18-0666, 2020 WL 4812647, at *2 (Iowa Ct. App. Aug. 19, 2020) ("Evidence that an electronic writing is what the proponent claims it is requires 'evidence sufficient to show that the purported author of the communication, whether it be an email, a Facebook posting, or a text message, actually authored or published the content.' 'Authenticating circumstances can include the context of an e-mail.'" (citation omitted)).

While Nayeli may have been able to authenticate the photo of the text message thread, she did not have sufficient personal knowledge to authenticate the thread itself. Nayeli's counsel had the ability to question both Clint and his ex-girlfriend, the alleged parties to the conversation, to attempt to authenticate the messages, but did not do so. Although Nayeli claims on appeal she would have testified that she recognized the messages in blue were sent by Clint, that foundation was never laid in the district court by offer or proof or otherwise. We find no abuse of discretion in the court's decision to sustain the objection to Nayeli's proposed exhibit based on the lack of foundation.

**D. Appellate Attorney Fees.** Clint requests appellate attorney fees of $6,527. An award of appellate attorney fees to the prevailing party rests in the court's discretion after consideration of the needs of the party requesting the award, the ability to pay of the other party, and the merits of the appeal. *See* Iowa Code § 600B.26; *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013). Nayeli earns almost twice as much as Clint and has the ability

13

to pay. Additionally, Clint was successful in defending his position in this appeal. We find it is reasonable to award Clint appellate attorney fees in the amount of $5,000.

### IV. Conclusion.

We affirm the district court's order granting primary physical care to Clint as well as the order granting in part and denying in part Nayeli's motion to reconsider, enlarge, or amend. We order Nayeli to pay Clint's appellate attorney fees in the amount of $5,000.

**AFFIRMED.**